# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

KATHLEEN S. BATES,

          Plaintiff,

vs.

ANDREW SAUL, Commissioner of
Social Security,

          Defendant.

No. 19-CV-0063-KEM

**MEMORANDUM OPINION
AND ORDER**

———————————————

Plaintiff Kathleen S. Bates seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Bates argues the Administrative Law Judge (ALJ) erred in weighing opinions from her treating psychiatrist and therapist, and by relying on testimony from the vocational expert (VE) because the ALJ failed to resolve a conflict in the VE's testimony. Bates also raises (for the first time) an Appointments Clause challenge in reliance on *Lucia v. SEC*, 138 S. Ct. 2044 (2018). For the reasons that follow, I **reverse** the Commissioner's decision.

## I.    BACKGROUND

Bates, who was born in 1960, obtained her bachelor's degree in business administration and has a strong work history. AR 32, 52, 175, 210.[1] From 1991 to 2016, she worked as an accounts receivable supervisor with Toyota. AR 32, 34-35, 176-78, 210, 350. In that position, she supervised thirty-eight cashiers in the accounts

---

[1] "AR" refers to the administrative record filed at Docs. 9-1 to 9-8.

receivable group (ensuring daily work distribution, performance, and completion); conducted monthly, quarterly, and annual performance reviews for twelve of her supervisees (meeting with them monthly); helped interview new associates; and attended department and team meetings. AR 32-33. Bates reported that she began experiencing recurrent bouts of depression in 2007. AR 36, 350. These issues started after Bates received a written warning at work following a coworker's accusations against her, including that she was "playing favorites." AR 35, 350. She reported that a similar incident occurred at work around 2010 and that she had ongoing issues with coworkers. AR 35-36, 350. This made Bates feel like she was constantly being watched and reported on, that people were thinking things about her, and that if she did not do her work perfectly, she would get in trouble. AR 36-37, 350. Bates felt harassed and threatened and reported that she tried to stay away from others at work. AR 350.

Bates began taking leave from work and sought mental health treatment following the incident in 2007. AR 350. She received counseling and began taking prescription medications (including Prozac, Zoloft, and Wellbutrin). AR 350-51. A previous manager that Bates had difficulty with returned to Toyota in May 2013, and Bates took time off of work in June and September of that year due to depression. AR 350. In October 2013, she began seeing counselor Katie Moon, LMHC, CADC (Therapist Moon), on a weekly basis. AR 351, 370. In February 2014, one of Bates's primary care providers referred her to psychiatrist Michael Simison, MD. AR 350. At that time, Bates had not been to work for a month and was taking leave under short-term disability and the Family Medical Leave Act. AR 350. Bates had not been caring for herself recently and was isolating—she only left her house when absolutely necessary. AR 351-53. Dr. Simison diagnosed schizoaffective disorder (depressive type) and explained that Bates had "a primary psychotic disorder that, though subtle, underlies many of her social and occupational difficulties and contributes to her major depressive episodes." AR 353.

2

Dr. Simison noted that Bates had socially isolated most of her life; he believed that her first psychotic episode occurred in her late teens and that she had another psychotic break at work in 2007. *Id.* Dr. Simison prescribed Risperdal and continued Bates's prescriptions for Zoloft and Wellbutrin. *Id.* Dr. Simison noted that "[t]he whole of [Bates's] anxiety seems isolated to issues with work though clearly there is anxiety related to interactions with others in general." AR 351.

Bates continued to see Therapist Moon for counseling and Dr. Simison for medication management. Dr. Simison adjusted Bates's dosages of Risperdol and Zoloft, added Klonopin to her regimen, and restricted her work hours when she returned to work in May 2014. AR 340-49. Dr. Simison continued to adjust dosages and tried other medications (including Effexor and Abilify), but Bates's symptoms persisted. AR 332-39. Bates also saw Therapist Moon, except for when Therapist Moon was on leave from around July to November 2014. AR 333-37. Bates's symptoms persisted, causing her to miss work. AR 332-39. Bates ultimately accepted early retirement from Toyota in late 2014 due to her depression and inability to get out of bed, be around people, and go to work. AR 35, 331.

After her retirement, Bates worked for short periods of time in other positions. AR 198, 224. From February to April 2015, she worked part time (four hours a day, three days a week) as a salesclerk, straightening clothing racks, showing customers to fitting rooms, and ringing up customers' purchases. AR 224, 227, 330. Bates worked full time as a mortgage specialist at a credit union from September 2015 to February 2016. AR 224. There, she opened mail, processed payments, and balanced books and reports. AR 226. By early December 2015, Bates had missed three weeks of work due to increased depression symptoms. AR 328, 382. She returned to work in January 2016, but after changes at work (including new management and being given greater responsibilities), she felt like she was being singled out as a scapegoat. AR 300, 327,

3

382. Bates saw a primary care provider, who had Bates move up her appointments with Dr. Simison and Therapist Moon. AR 300. Despite a medication adjustment and two visits with Therapist Moon, Bates remained overwhelmed and had trouble caring for herself and getting out of bed. AR 327, 383. She was let go after she continued to miss work. AR 326, 383. From May to October 24, 2016 (the alleged onset date), Bates worked as an accounts receivable clerk. AR 224-25. She described this position as a simple job, where she processed payments, balanced daily cash receipts, opened mail, and answered customer phone calls. AR 33, 41, 225. She did well until October, when her mood "tanked," she stopped taking care of herself, and she missed several weeks of work. AR 323-24, 384, 386. Bates resigned from that position after missing several weeks of work and has not worked since. AR 34, 357, 386.

On November 1, 2016, Bates filed for DI benefits, alleging her depression and anxiety had caused her to be disabled since October 24, 2016. AR 51-53. Her application was denied initially on December 12, 2016, and on reconsideration on March 29, 2017. AR 51-79. At Bates's request, the ALJ held an administrative hearing on September 24, 2018. AR 11, 25. Bates appeared and testified by video, and a vocational expert (VE) appeared and testified by telephone. AR 11, 26-27. The ALJ issued a written opinion on October 29, 2018, and following the familiar five-step process outlined in the regulations,[2] determined that Bates was not disabled. AR 11-20. The ALJ found that Bates suffers from severe impairments of affective disorder and anxiety disorder, but that her impairments did not meet or equal a listing. AR 13-15. The ALJ determined that

---

[2] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. § 404.1520(a)(4)**.

Case 1:19-cv-00063-KEM   Document 18   Filed 08/24/20   Page 4 of 23

Bates had the RFC[3] to perform work at all exertional levels with the following nonexertional limitations:

> [Bates] can understand, remember, and carry out simple work instructions and tasks at a [specific vocational preparation (SVP)]2 level. She can have occasional contact with coworkers, supervisors, and the general public. She should not do teamwork types of job duties. She should not work with the general public as a primary job duty.

AR 15. In making this determination, the ALJ considered: Bates's statements about her symptoms and their limiting effects (finding them inconsistent with the other evidence); her activities of daily living; medical treatment records and observations; the conservative nature of her treatment; opinions from reviewing state agency consultants (giving them great weight); medical source opinions from Dr. Simison and Therapist Moon (assigning them little weight); Bates's Global Assessment of Functioning (GAF) scores; statements from Bates's boyfriend and parents (giving these each little weight); and other medical opinions (finding they were not backed by acceptable medical testing and notes). AR 16-18. Based on the RFC determination and the VE's testimony, the ALJ found that Bates was unable to perform her past relevant work as a supervisor accounting clerk or accounting cashier. AR 19. The ALJ found that Bates could, however, perform other work: cleaner/lab equipment, order filler, and cleaner/hospital. AR 19-20. Thus, the ALJ found that Bates was not disabled. AR 20.

The Appeals Council denied Bates's request for further review on April 17, 2019 (AR 1), making the ALJ's decision that Bates was not disabled the final decision of the Commissioner. *See* **20 C.F.R. § 404.981**. Bates filed a timely complaint in this court (Doc. 1). *See* **20 C.F.R. § 422.210(c)**. The parties briefed the issues (Docs. 12, 13, 14) and consented to the jurisdiction of a United States magistrate judge (Doc. 7).

---

[3] RFC means "the most that a claimant can do despite her limitations." ***Sloan v. Saul***, 933 F.3d 946, 949 (8th Cir. 2019) (citing **20 C.F.R. § 416.945(a)(1)**); *accord* **20 C.F.R. § 404.1545(a)(1)**.

## II.    DISCUSSION

A court must affirm the Commissioner's decision if it "is supported by substantial evidence in the record as a whole." ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**. "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion." ***Noerper v. Saul***, 964 F.3d 738, 744 (8th Cir. 2020) (quoting ***Combs v. Berryhill***, 878 F.3d 642, 646 (8th Cir. 2017)). The court considers the record as a whole—reviewing both evidence that supports and that detracts from the ALJ's decision. *Id*. If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the court] must affirm the decision." ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

Bates argues the ALJ erred in weighing opinions from Dr. Simison and Therapist Moon, and by relying on the VE's testimony because the ALJ left unresolved an apparent conflict regarding reasoning level. Bates also argues that the ALJ's appointment to that position violates the Appointments Clause of the United States Constitution.

### A. Weight Assigned to the Medical Opinions

Bates argues the ALJ failed to provide good reasons for giving little weight to Dr. Simison's and Therapist Moon's opinions. When determining a claimant's RFC, the ALJ considers "medical opinions . . . together with the rest of the relevant evidence." **20 C.F.R. § 404.1527(b)**. The ALJ considers the following factors to determine the weight to assign an opinion assessing a claimant's RFC:

> (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is

6

related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

*Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current **20 C.F.R. § 404.1527(c)**).

Dr. Simison and Therapist Moon each completed a medical source statement on January 19, 2017 (AR 362-77), and they both reaffirmed these opinions on May 29, 2018 (AR 419-20). Dr. Simison noted that he first saw Bates on February 18, 2014, and thereafter, on average, every one to three months. AR 362. He listed a diagnosis of schizoaffective disorder, depressive type, and based his findings about the severity of Bates's impairments and her symptoms on clinical findings showing that when Bates worked, she exhibited depression, anhedonia, paranoia toward coworkers, and a lack of personal grooming. *Id*. Dr. Simison explained that Bates responded well to medication and had a good prognosis when not working, but that she deteriorated and had minimal response to medication and a poor prognosis when she worked. AR 363. Therapist Moon first saw Bates on October 22, 2013, and one to four times per month thereafter (depending on Bates's symptoms). AR 370. Therapist Moon listed a diagnosis of schizoaffective disorder. *Id.* She explained that Bates's mental health had declined since 2013; she had missed numerous weeks of work due to anxiety, depression, and loss of motivation; her symptoms continued despite modified schedules and new positions with less stress; and her symptoms affected her "ability to maintain social relationships, manage household tasks, and interact in the community." *Id.* Therapist Moon noted that Bates's symptoms would likely continue, with the severity increasing over time. AR 371.

Dr. Simison and Therapist Moon found Bates had limitations in her mental abilities and aptitudes, including the following:

- **Maintain regular attendance and be punctual within customary, usually strict tolerance**: unable to meet competitive standards (Dr. Simison); no useful ability to function (Therapist Moon).

- **Complete a normal workday and workweek without interruptions from psychologically based symptoms**: no useful ability to function (Dr. Simison and Therapist Moon).

- **Deal with normal work stress**: no useful ability to function (Dr. Simison and Therapist Moon).[4]

AR 365-66, 373-74. Dr. Simison and Therapist Moon each concluded that Bates would miss more than four days of work per month due to her mental impairment. AR 366, 374. Dr. Simison explained:

> [Bates], with minimal work stress, decompensates quickly. She has rapid increase in depressive symptoms [and] onset of paranoia toward co-workers. As this progresses she becomes unable to leave bed or even perform basic daily functions, such as bathing.

AR 366. Therapist Moon wrote that even with modifications (such as leaves of absence, modified schedules, and working lower-stress positions), Bates had "consistently struggled with regular work attendance" and that "her symptoms make it impossible to attend on a daily basis." AR 374. Therapist Moon elaborated that "[h]istory had shown that [Bates] is unable to maintain regular work, even in a low-stress environment." *Id*.

---

[4] They also both found that Bates had extreme functional limitation in the area of episodes of decompensation (lasting at least two weeks each) within a twelve-month period—finding Bates had a "[m]edically documented history of chronic mental, schizophrenic, etc., or affective disorder of at least 2 years duration that has caused more than a minimal limitation to do any basic work activity, with symptoms or signs currently attenuated by medication or psychological support." AR 367, 375. Dr. Simison noted that Bates had periods of decompensation from September to October 2014, from December 2015 to February 2016, and from October to December 2016. AR 367. Therapist Moon checked the box that Bates had "three or more episodes of decompensation within 12 months, each lasting at least two weeks long." AR 375. This corresponded to the periods when Bates was working and her mental health declined. AR 323-24, 326-28, 382-84, 386.

8

The ALJ gave little weight to Dr. Simison's opinion because: (1) it was not consistent with his observation notes (which the ALJ found generally showed normal findings); (2) Bates showed improvement with treatment; (3) the opinion failed to specify the period to which it applied; and (4) it was not consistent with treatment records from other providers (including Therapist Moon). AR 17. The ALJ also gave little weight to Therapist Moon's opinion after noting her conclusion that Bates would miss more than four days of work per month. *Id.* The ALJ found that Therapist Moon's opinion was not consistent with: (1) her own treatment notes (the ALJ found these showed "little abnormalities" in 2015-2016 while the notes from 2017-2018 were blank); (2) the frequency of treatment she offered Bates; and (3) Dr. Simison's treatment notes. AR 17-18. In discussing his RFC determination, the ALJ also noted the lack of frequency with which Bates had seen her psychiatrist and therapist, and noted that Bates's providers had not recommended increased treatment since her alleged onset date. AR 16.

The ALJ's decision to give little weight to Dr. Simison's and Therapist Moon's opinion that Bates would miss more than four days of work per month is not supported by substantial evidence. Fundamentally, the ALJ failed to recognize the nature of Bates's mental impairment—that it improved and declined, primarily due to stressors.

> Schizoaffective disorder is a mental health disorder that is marked by a combination of schizophrenia symptoms, such as hallucinations or delusions, and mood disorder symptoms, such as depression or mania." Schizoaffective Disorder, Mayo Clinic,
> https://www.mayoclinic.org/diseases-conditions/schizoaffective-disorder/symptoms-causes/syc-20354504 (last updated Nov. 9, 2019) . . . . "Factors that increase the risk of developing schizoaffective disorder include: … Stressful events that may trigger symptoms." *Id*.; *see also* Schizoaffective Disorder, Nat'l Alliance on Mental Illness, https://www.nami.org/About-Mental-Illness/Mental-Health-Conditions/Schizoaffective-Disorder (Although the cause of schizoaffective disorder is unknown, "Stressful events such as a death in the family, end of a marriage or loss of a job can trigger symptoms or an onset of the illness.").

9

*Reinicke v. Comm'r Soc. Sec.*, No. 3:19-cv-103, 2020 WL 2110586, at *4 (S.D. Ohio May 4, 2020) (concluding ALJ's decision to give little weight to treating physician's opinion was not supported by substantial evidence, in part because the ALJ failed to recognize the nature of claimant's condition, concluding instead that it was situational in nature). Dr. Simison explained "[s]chizoaffective disorder is a life-long, chronic, relapsing condition. Although treatment (medication) may alleviate symptoms, the disorder is not 'curable.'" AR 363. He also made it clear that work triggered Bates: she did not respond well to treatment while under the stress of work, which caused paranoia toward coworkers and a deterioration in her condition to the point she neglected self-care and did not get out of bed. AR 362-63, 366; *see also* AR 323, 327, 337-41, 344-45, 347-49, 352 (Dr. Simison noted that Bates exhibited negative thoughts and paranoia during periods when worked); AR 364, 372 (both Dr. Simison and Therapist Moon noted paranoid thinking or inappropriate suspiciousness as a sign and symptom of Bates's condition). Therapist Moon noted that Bates's condition has declined since 2013 and that her symptoms will likely continue to be problematic and increase in severity over time. AR 370-71. Dr. Simison and Therapist Moon each explained that Bates did well when she was not working, but that even low-stress work exacerbated her symptoms.

> With regard to mental disorders, the Commissioner's decision "must take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes." *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir.1984). Given the unpredictable course of mental illness, "[s]ymptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse." *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir.1996). Moreover, "[i]ndividuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms." **20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E) (1999)**. "Such individuals may be much more impaired for work than their signs and symptoms would indicate." *Id*.

10

***Hutsell v. Massanari***, 259 F.3d 707, 711 (8th Cir. 2001).

In this case, the ALJ relied upon the treatment records (including the most recent entries) that showed Bates had stable symptoms and normal examination results. AR 16-17; *see also* AR 14 (in considering applicable listings, the ALJ noted that Bates had good memory, intact concentration and insight, goal-directed thinking, and appropriate mood and affect). Indeed, the most recent treatment records showed improvement—but this was after she stopped working in late October 2016. *See* AR 324-25 (neutral mood, pleasant affect, and intact concentration in March and September 2016); AR 357 (mood down at times but brighter affect and intact concentration in late December 2016); AR 450-52 (neutral mood, pleasant affect, and intact concentration in June and December 2017 and May 2018). Considering the entire record, however, these findings do not demonstrate that Bates could sustain regular attendance at work. *See **Martinez v. Comm'r Soc. Sec.***, No. 6:18-03332-CV-RK, 2020 WL 39199, at *2 (W.D. Mo. Jan. 3, 2020) (examinations showing claimant was alert, oriented, and acted appropriately did not demonstrate claimant was capable of consistently appearing for work, and holding that such records were an insufficient basis for ALJ to disregard treating physician's opinions—including that claimant would miss work four or more days per month).

Dr. Simison's and Therapist Moon's opinions were based on their treatment of Bates over a number of years (not just since her alleged onset date), during which time her symptoms waxed and waned. From this context, their opinions are consistent with their treatment notes. Dr. Simison's most recent records note that Bates's improvement was a result of her not working. AR 450-52. He noted during an October 27, 2016 visit (right after Bates's alleged onset date) that Bates's decline in condition (including failing to bathe and missing work) were consistent with patterns during prior employment. AR 323.

11

Relatedly, Dr. Simison's and Therapist Moon's opinions are consistent with their mental status examinations of Bates:

- **Worsened symptoms** from **February to October 2014** (when Bates was working, except for some improvement in **August 2014** after being absent from work) (AR 334-49);

- **Improved symptoms** in **November 2014** (following Bates's retirement) **through October 2015** (when she started a new job) (AR 329-32, 379-80);

- **Worsened symptoms** in **December 2015 through February 2016** (when Bates stopped working, except improvement in January 2016 due to medication change) (AR 326-28, 382-83);

- **Improved symptoms** during visits in **March, June, August, and September 2016** (after Bates stopped working) (AR 324-25, 384);

- **Worsened symptoms** in **late October 2016** (after Bates started a new job in May 2016) **through December 2016** (after she stopped working in late October 2016) (AR 323, 357, 385-86);

- **Improved symptoms** after **late December 2016** (when Bates was not working).  AR 387, 450-52.

Specifically, during time periods when Bates worked, Dr. Simison recorded that Bates exhibited decreased grooming (AR 323, 326-27, 334, 341, 349, 352), fair to poor concentration and memory (AR 323, 337-41, 347, 349, 352), paranoia or fixation on work problems (AR 323, 327, 338-41, 343-45, 347-49, 352), and poor insight and judgment (AR 326, 334, 336-38).  During these periods, Dr. Simison and Therapist Moon noted that Bates missed scheduled work (AR 323, 327-28, 334, 337-38, 341, 350, 382-83, 386), isolated or had difficulty with daily functioning (AR 327, 337, 383), and exhibited a depressed and often anxious mood (AR 323, 326-28, 333-35, 337, 339-42, 344-45, 347-49, 382-84, 386).  Overall, the examination findings from Dr. Simison and Therapist Moon support their opinions that Bates suffered significant limitations in being

12

able to maintain regular attendance, in completing a normal workday without interruption, and in dealing with normal work stress, and that she would miss more than four days of work per month.

Similarly, the ALJ's reliance on Bates's improvement with treatment[5] to discount Dr. Simison's opinion is flawed. Dr. Simison prescribed various medications for Bates and adjusted the dosages of those medications over the course of treating Bates, which generally corresponded to periods when she worked and her symptoms worsened. *See* AR 342, 344-45, 347-49, 353 (antipsychotic medication started in February 2014 and medication dosages adjusted through April 2014); AR 337 (antidepressant medication changed in July 2014); AR 334-35 (dosages adjusted in September and October 2014); AR 332 (antipsychotic medication changed in November 2014); AR 327-30 (dosages adjusted in March, August, and December 2015 and in February 2016); AR 323-24 (dosages adjusted in September and October 2016). Although he specifically noted in late October 2016 that Bates regularly took her medication, Dr. Simison still noted a decline during Bates's review of symptoms and mental status examination, which he attributed to the stress that employment caused Bates. AR 323. Bates had temporary improvement with adjustments to her medication and dosages, but the only lasting progress she experienced occurred when she stopped working. *See* AR 357, 450-52 (no medication changes after December 2016, when Dr. Simison noted Bates's paranoia had improved without the stress of work). Even though Bates took the various medications and received individual counseling, she resigned or was terminated from multiple jobs due to her ongoing symptoms. AR 323-49, 357, 383, 386. Bates's improvements were not inconsistent with either Dr. Simison's or Therapist Moon's opinions.

> "It is possible for a person's health to improve, and for the person to remain too disabled to work." *Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir. 2003). . . . "It is inherent in psychotic illnesses that periods of remission will occur, and that such

---

[5] The ALJ did not further address the treatment Bates received or its effectiveness.

remission does not mean that the disability has ceased. Indeed, one characteristic of mental illness is the presence of occasional symptom-free periods." ***Andler v. Chater***, 100 F.3d 1389, 1393 (8th Cir. 1996) (internal citations omitted). "Although the mere existence of symptom-free periods may negate a finding of disability when a physical ailment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of a claim." ***Id***.

***Bland v. Saul***, No. 2:18-CV-95 NAB, 2020 WL 1929786, at *8 (E.D. Mo. Apr. 21, 2020) (bold emphasis added); *see also* ***Hutsell***, 259 F.3d at 712 (finding "the Commissioner erroneously relied too heavily on indications in the medical record that [the claimant] was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity"); ***Martinez***, 2020 WL 39199, at *4 (notation from treating physician that claimant was overall greatly improved and was the best the provider had seen "d[id] not support the ALJ's broader assertion that [claimant]'s mental conditions improved— i.e., his major depression with antipsychotic features, obsessive compulsive personality trait disorder, and generalized anxiety disorder," and thus, was an insufficient reason for discounting the treating physician's opinion). Here, the ALJ's reliance on Bates's improvement to discount Dr. Simison's opinion is not supported by the record.[6]

The ALJ provided no explanation for how Dr. Simison's and Therapist Moon's opinions were inconsistent with their own records or with records from other providers.

---

[6] In *Black v. Barnhart*, 237 F. Supp. 2d 1099, 1105, 1107-08 (S.D. Iowa 2002), the court noted that the claimant (who had bipolar affective disorder, recurrent major depressive disorder, and personality disorder) may have appeared "to function normally" while in "highly supportive environments surrounded by her family." The court in that case discussed *Pagan v. Bowen*, 862 F.2d 340 (D.C. Cir. 1988), in which the claimant's physician stated (similar to Dr. Simison in this case) that the claimant "was at significant risk of relapse which could be triggered by stress or anxiety." ***Id***. at 1108. The court found the claimant's symptom-free periods did not equate to an ability to work on a sustained basis (citing ***Hutsell***) and concluded that the claimant's inability to keep jobs and other evidence in the record overwhelmingly supported her disability claim based on her chronic bipolar disorder. ***Id***. at 1107-09.

14

*See Morrison*, 906 F. Supp. 2d at 860 (noting ALJ's failure to specify any inconsistencies between physician's medical opinion and his treatment records and concluding the ALJ's reasoning (that the records were more consistent with the RFC determination than the physician's opinion) was not supported by substantial evidence). There are few records from other providers, but the available treatment notes from Bates's primary care providers, Jennifer Berns, PA-C (who initially referred Bates to Dr. Simison in 2014) (AR 350) and Jill Flory, MD, adopted the diagnosis of schizoaffective disorder, depressive type. AR 292, 295, 300. These records reflect that Bates had appropriate mood and affect during a visit for a cold on December 1, 2015 (Bates had started working again in September 2015). AR 224, 302-03. Bates next saw PA Berns for depression on February 4, 2016, and reported she had not been to work that week and that her stress had been building over the past few weeks following changes at work. AR 300. On exam, PA Berns noted that Bates had regular speech, normal thought process, intact judgment and insight, and no indication of delusion, but that she also had moderate grooming, poor eye contact, depressed mood, and flat affect. AR 301. PA Berns provided a written work excuse through February 8 and had Bates call (during the visit) to schedule appointments with Dr. Simison (who she was not scheduled to see until May) and Therapist Moon (to move up her appointment scheduled for February 15).[7] AR 300-01. At a wellness exam on March 31, 2016 (after losing her job in February), Bates reported doing well on her current medications and looking for an office position, and

---

[7] Bates saw Dr. Simison on February 11, and he increased her medication (Bates felt overwhelmed, had been isolating, and stopped caring for herself; she had fair grooming, a depressed mood, blunt affect, and exhibited paranoia); Bates saw Dr. Simison again on February 25 (she had been let go after continuing to miss work; her mood was depressed but stable and up a bit, and she no longer exhibited paranoia). She saw Therapist Moon on February 9 (Bates expressed a desire to work but felt overwhelmed and had an anxious and depressed mood), February 12 (she felt frustrated at her inability to cope with stress and had an anxious and depressed mood), and February 25 (she felt some relief after being fired; her mood was anxious but pleasant). AR 383.

Dr. Flory noted appropriate mood, affect, insight and judgment. AR 295, 297-98. During preventative exams in April 2017 and May 2018 (after she stopped working for good in late October 2016), Bates was stable and doing well on her current medications, had no signs of depression or anxiety, and had appropriate mood, affect, insight, and judgment. AR 433, 435-36, 441, 443-44.[8] These records support that Bates's condition declined when she worked and improved when she did not work, which is consistent with Dr. Simison's and Therapist Moon's records and opinions.

The ALJ also found Therapist Moon's opinion was "inconsistent with the frequency of treatment being offered." AR 18. The ALJ did not otherwise explain how this is inconsistent with Therapist Moon's opinion. Indeed, it does not seem inconsistent that Bates would receive no or less frequent counseling during periods when her symptoms were improved. The records show that Bates saw Therapist Moon fairly consistently (once a week to once every other month) from February 2015 through at least February 2017. AR 379-87. Bates testified in September 2018 that she saw Therapist Moon every couple of months. AR 37. The ALJ relied on Therapist Moon's records from 2017-18 being blank to discount Therapist Moon's opinion. AR 18. The prior records from Therapist Moon (covering the period from February 18, 2015, up to February 22, 2017), were submitted by Mercy Family Counseling in Hiawatha, Iowa, on March 16, 2017. AR 378-87. The 2017-2018 records the ALJ cited to (AR 391-418) are listed in the administrative record as Mercy Care Marion hospital records (Doc. 9-1 at 3), and come from Mercy Medical Center in Cedar Rapids, Iowa (AR 391-418). These records indicate that Bates had telephone encounters with Therapist Moon (at Mercy

---

[8] The only other treatment records showed that Bates had normal mood and affect in October 2016 during a visit for gastrointestinal issues (AR 292-93), in November 2017 during a visit for a cold (AR 438-39), and in June 2018 during a visit for a cold sore (AR 429, 431). None of these records addressed Bates's mental health issues. *See also* AR 315 (no record of mood or other psychiatric issues during November 2015 visit for shoulder injury).

16

Family Counseling – Marion Clinic) on April 19, June 21, August 30, October 25, and December 20 in 2017, and on February 14 and May 9 in 2018.[9] AR 393, 397, 401, 405, 409, 413, 417. These records list Bates's basic history and medications, but provided no other information. AR 391-418. It is unclear why the format and provider of the two sets of records vary. The ALJ should have obtained Therapist Moon's additional records before discounting her opinion based on the records being blank. *See, e.g., Martinez*, 2020 WL 39199, at *4 (concluding the ALJ should have obtained additional information to clarify the physician's records before weighing the physician's opinion; *see also Noerper*, 964 F.3d at 747 (in discussing duty to develop the record, the Eighth Circuit noted "the Commissioner's duty exists alongside the claimant's burden to prove her case," and that the court had remanded cases where the ALJ failed to explain a choice between conflicting medical evidence). Even if additional records from Therapist Moon reflected normal findings, it would not be surprising as Bates's symptoms improved after she stopped working in October 2016.

The record demonstrates that the frequency of Bates's treatment corresponded to her periods of employment. Bates testified in September 2018 that she went to counseling every couple of months and saw Dr. Simison around every six months. AR 36. She saw him more frequently, however, (once per week to once per month) around times when she worked and her symptoms worsened, and less frequently (every two to six months) during periods when she was absent from work or was not working. AR 323-50, 357, 450-52; *see also* AR 38 (Bates testified she saw Dr. Simison more frequently when her depression was more severe while she was working). The ALJ did not explain how frequently Bates should have received counseling in order for Therapist Moon's opinion to hold greater weight. *See Martinez*, 2020 WL 39199, at *3 (finding ALJ's reliance on

---

[9] The record shows that Bates began seeing Therapist Moon in October 2013 (AR 370) and had been seeing her weekly when Bates first saw Dr. Simison in February 2014 (AR 349, 351); those records are not part of the administrative record in this case.

17

infrequency of treatment "d[id] not square with [the ALJ's] decision to give greater weight to a non-examining physician's opinion" than to the opinion from claimant's treating physician).

The ALJ similarly found that Dr. Simison's opinion "fail[ed] to note any periods, to which the opinion applie[d]." AR 17. Failing to give controlling weight to Dr. Simison's opinion on that basis is not supported by the record. Dr. Simison's opinion—dated January 19, 2017—stated he began seeing Bates on February 18, 2014, and that he saw her from once per month to once every three months. AR 362, 369. The medical records from Dr. Simison spanned the period from February 18, 2014, through May 31, 2018, and showed he saw Bates from once per week to every six months during that period. AR 323-53, 357-58. Dr. Simison reaffirmed his January 2017 opinion on May 29, 2018. AR 420. Thus, it is unclear how the period to which his opinion applied was at issue, and this was not a good reason for the ALJ to discount his opinion. Overall, the length, nature, frequency, and extent of treatment that Bates received from Dr. Simison and Therapist Moon weigh in favor of giving their opinions great weight.

The only other medical opinions in the record came from Dr. Tirado and Dr. Ryan, the state agency reviewing consultants. They both opined that Bates could complete one-to-two step repetitive tasks in a low stress environment. AR 60-61 (Dr. Tirado's December 2016 opinion), 76 (Dr. Ryan's March 2017 opinion).[10] In the narrative section, they outlined Dr. Simison's treatment records from February 2014 through October 2016, Bates's activities of daily living, and information provided by Bates's boyfriend. AR 60-61, 75-76. The ALJ noted these opinions were based on a review of Bates's file and gave them great weight, finding they were "consistent with the

_____

[10] Dr. Tirado (on initial review) and Dr. Ryan (on reconsideration) found Bates had moderate limitations in her abilities to carry out detailed instructions, maintain attention and concentration, complete a normal workday without interruptions and perform at a consistent pace, and respond appropriately to changes in the work setting. AR 59-60, 74-75.

18

overall record, which showed minimal observations on examination as well as [Bates]'s minimal need for treatment and independent functioning."  AR 17.

"An ALJ may 'discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)).  Drs. Tirado and Ryan found that Bates had no significant limitation in her ability to maintain regular attendance and be punctual within customary limits (AR 59, 74), but did not fully explain this finding.  Nor did Dr. Ryan explain her conclusion that Bates was moderately limited in her ability to interact with the public (compared to Dr. Tirado's finding that Bates had no significant limitation in social interactions).[11]  AR 60-61, 74-76.  Dr. Ryan noted on reconsideration that although Bates reported worsening symptoms, the overall record—including an updated treatment note (from February 2017, showing Bates "was slightly less anxious" and had a depressed but pleasant mood and normal psychomotor activity, thought process, insight, and judgment) and updated forms outlining Bates's activities of daily living—warranted affirming Dr. Tirado's initial RFC assessment.  AR 76.  Drs. Tirado and Ryan's RFC assessment was qualified—they noted that it was based on Bates being in a low stress environment and that "she w[ould] have some difficulty with sustaining attention/concentration, maintaining pace, and handling stress/changes," and that "[s]ome cognitive variability c[ould] be expected given her mood."  AR 60-61, 75-76.  Considering the overall record as discussed above, their opinions, which were based on a review of Bates's file and not

---

[11] Dr. Tirado found Bates had no significant limitation in her ability to have social interactions based on "her ability to socialize with boyfriend, shop in stores, superficially interact with providers, navigate the community alone, and go out to eat".  AR 60-61.  Dr. Ryan found Bates was moderately limited in her ability to interact appropriately with the general public (but not in her ability to interact with supervisors and coworkers).  AR 74-75.

Case 1:19-cv-00063-KEM   Document 18   Filed 08/24/20   Page 19 of 23

examinations, do not constitute better or more thorough evidence that outweighs Dr. Simison's and Therapist Moon's opinions.

Other factors further undermine the ALJ's decision. The ALJ did not address whether Dr. Simison's and Therapist Moon's opinions were supported by "medically acceptable clinical and laboratory diagnostic techniques." *Martinez*, 2020 WL 39199, at *4 (quoting *Goff*, 421 F.3d at 790). Both Dr. Simison and Therapist Moon listed that Bates exhibited the following signs and symptoms to explain their opinions: anhedonia (inability to experience pleasure) or pervasive loss of interest in activities; decreased energy; feelings of guilt or worthlessness; generalized persistent anxiety; mood disturbance; persistent disturbance of mood or affect; paranoid thinking or inappropriate suspiciousness; and emotional withdrawal or isolation. AR 364, 372. Dr. Simison also checked difficulty thinking or concentrating, and seclusiveness (AR 364), and Therapist Moon further noted appetite disturbance with weight change; blunt, flat or inappropriate affect; apprehensive expectation; persistent irrational fear of an activity or situation (work) resulting in a compelling desire to avoid that activity or situation; unstable interpersonal relationships; easy distractibility; and sleep disturbance (AR 372).[12] These findings are consistent with their treatment notes and generally support their conclusion about Bates's ability to perform within a schedule and maintain regular attendance.

In addition, Bates's continued efforts and desire to work are significant. *See Hutsell*, 259 F.3d at 713 (noting claimant's prior consistent work history supported her disability claim); *Morrison*, 906 F. Supp. 2d at 858-59 (discussing how claimant contemplating work in the context of mental (versus physical) impairments is not

---

[12] Dr. Simison also noted that Bates had thoughts of suicide, which is inconsistent with his mental status examinations. AR 364, 323-49, 357, 450-52. Therapist Moon noted that Bates had recurrent and intrusive recollections of a traumatic experience that was a source of marked distress (AR 372), but it is unclear what she was referring to.

indicative that the claimant was not disabled because "symptom free periods are often inherently characteristic of [mental health] impairments"). Bates had a long career at Toyota prior to her early retirement in 2014 (due to mental health issues). After that time, she expressed a strong desire to be employed, attempted different jobs, and conveyed frustration and disappointment at not being able to work. AR 224, 324, 330, 340, 380, 382-84, 386. Despite treatment, Bates left or was terminated from these jobs due to her increased symptoms. AR 324-49, 357, 379-86. Bates's overall employment history supports the opinions from Dr. Simison and Therapist Moon about Bates being absent from work. *See Bland*, 2020 WL 1929786, at *7 (relying on claimant's work history ("she left her last two jobs due to the effects of her symptoms and impairments on her [functional ability to interact with others]") to find substantial evidence did not support the ALJ's decision to discount opinion from advanced practice registered nurse).

Finally, Dr. Simison qualified as a treating source, meaning his opinion was generally entitled to great weight. *Despain v. Berryhill*, 926 F.3d 1024, 1027 (8th Cir. 2019). "[T]reating sources . . . are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." *Morrison*, 906 F. Supp. 2d at 857-58 (quoting **20 C.F.R. § 404.1527(c)(2)**). Dr. Simison's opinion was also related to his area of specialty as a psychiatrist. *Owens*, 551 F.3d at 800; *see also Noerper*, 964 F.3d at 745 (noting that generally the ALJ should "place more weight on the opinions of specialists over generalists where opinions conflict and evidence does not otherwise provide reasons for rejecting the specialist's opinion" (citing **20 C.F.R. § 404.1527(c)(5)**)). In this case, the ALJ mentioned neither of these factors and appears to have not considered them in weighing Dr. Simison's opinions. "[A] treating physician's opinion 'should be granted controlling weight if it is well-supported by

21

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Despain*, 926 F.3d at 1027 (citations omitted); *see also* **20 C.F.R. § 404.1527(c)(2)**. "Although a treating physician's opinion is usually entitled to great weight, it 'do[es] not automatically control, since the record must be evaluated as a whole.'" *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) (alteration in original) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "Whether the ALJ gives the opinion of a treating physician great or little weight, the ALJ must give good reasons for doing so." *Id*.

The ALJ erred by not giving controlling weight to Dr. Simison's opinion. *See Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (ALJ failed to give good reasons for discounting treating neurologist's opinion). In *Singh*, the Eighth Circuit found the record was "replete with evidence that substantiate[d] the opinion of [the claimant]'s treating physician"—pointing out that the claimant "consistently sought medical treatment for his pain and . . . under[went] numerous procedures," that the claimant's pain "c[ould] be directedly attributed to an objective finding" (claimant's diagnosis and condition), and that clinical data amply supported the treating physician's opinion. *Id*. The court also noted that the treating physician was a specialist, meriting greater weight for his opinion compared to opinions from the non-specialist consulting physicians. *Id*. This same reasoning applies to Dr. Simison's opinion (in particular his conclusion about Bates being absent from work) for the reasons outlined above.

Substantial evidence does not support the ALJ's reasoning for giving little weight to Dr. Simison's and Therapist Moon's opinions, and each of the relevant factors weigh in favor of their opinions. Their opinions were based on their longitudinal treatment of Bates, they were consistent with their own treatment records and records from other providers, and they related to their areas of expertise. The ALJ also erred by not giving Dr. Simison's opinion controlling weight as a treating-source opinion. Because the

22

record supports Dr. Simison's and Therapist Moon's opinions about Bates's inability to maintain regular attendance and handle normal work stress and that she would miss more than four days of work per month, the ALJ should have included a limitation about Bates being absent from work in the RFC determination.

I conclude that this matter should be remanded for an award of benefits, as the record "overwhelmingly supports" a finding of disability, as outlined above. *See Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000); *see also* AR 48 (VE testified that missing one day of work per month would preclude Bates from competitive employment). Based on this finding, I decline to address Bates's other assignments of error.

## III.    CONCLUSION

I reverse the Commissioner's decision and remand for an award of benefits. Judgment shall enter in favor of Bates.

**IT IS SO ORDERED** this 24th day of August, 2020.

Kelly K.E. Mahoney
United States Chief Magistrate Judge
Northern District of Iowa

23